1
2
3
4
5
6
7
8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   CURTIS BOYD,                          )   Case No. 1:13-01966-LJO-SAB (PC)
                                           )
12                  Plaintiff,             )
                                           )   FINDINGS AND RECOMMENDATIONS
13         v.                              )   REGARDING DEFENDANTS' MOTION FOR
                                           )   SUMMARY JUDGMENT
14   C. ETCHEBEHERE, et.al.                )
                                           )   [ECF No. 84]
15                  Defendants.            )
                                           )
16   _____ )

17         Plaintiff Curtis Boyd is appearing pro se and in forma pauperis in this civil rights action

18   pursuant to 42 U.S.C. § 1983.

19         Currently before the Court is Defendants' motion for summary judgment, filed February 6,

20   2017.

21                                          **I.**

22                                   **RELEVANT HISTORY**

23         This action is proceeding on Plaintiff's first amended complaint against Defendants R.

24   Guembe, C. Etchebehere, D. Perkins, B. Odle, F. Cote, J. Ojeda, J. Gallagher and D. Hetebrink for

25   denial of Plaintiff's right under the First Amendment by requiring him to participate in the prison's

26   Religious Meat Alternative Program in order to receive his religiously mandated Ramadan and

27   evening meals.

28   ///

On March 25, 2016, Defendants filed an answer to the complaint. On March 30, 2016, the Court issued the discovery and scheduling order.

As previously stated, on February 6, 2017, Defendants filed a motion for summary judgment. Plaintiff filed an opposition on June 5, 2017, and Defendants filed a reply on June 7, 2017. (ECF Nos. 101, 102.)

On April 24, 2017, Plaintiff filed a motion to suppress his deposition, and Defendants filed an opposition on April 27, 2017. The Court denied Plaintiff's motion on May 1, 2017.

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## SUMMARY OF PLAINTIFF'S COMPLAINT[1]

In or around the year 2010, Catholic Chaplain J. Ojeda held a meeting with two Halal food companies to evaluate the possibility of purchasing holistic Halal food. After being presented with samples of Halal food trays, consisting of meats, vegetables, fruits and grains that make-up a Halal diet, J. Ojeda recommended to staff at California Substance Abuse and Treatment Facility (SATF) a Halal diet. Defendants J. Ojeda, F. Cote, and D. Perkins decided to provide only meat substitute to any persons requesting a religious diet. The program was titled the Religious Meat Alternative (RMA).

On or about June 5, 2012, C. Etchebehere was advised and informed by, food administrator L. Maurino that there was presently an established procedure for Muslim inmates at SATF. According to the procedure, Muslim inmates who wanted to participate in the coming Ramadan fasting would sign-up at or from the Friday "Jumah" prayer service list.

---

[1] This action is proceeding on Plaintiff's first amended complaint, filed November 6, 2015. (ECF No. 47.) Because Plaintiff's first amended complaint is verified it constitutes an opposing affidavit for purposes of ruling on a motion for summary judgment. <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004).

On or about June 18, 2012, Defendants C. Etchebehere, J. Ojeda, F Cote, J. Gallaher, B. Odle, D. Perkins, D. Hetebrink and R. Guembe, agreed to change the enrollment procedure and criteria for Muslim only participation and criteria for Muslim inmate at SATF, from the standard Muslim only participation, by way of the use of the Friday "Jumah" prayer services sign-up procedures to the exclusive use of the RMA list, which was for Muslims only. Not all Muslims were enrolled in the RMA.

Defendants C. Etchebehere and F. Cote then forced Plaintiff under pains of hunger to enroll in and participate in the RMA program with non-Muslims, in order to receive permission for SATF to receive food for the early morning Sahoora, i.e. pre-dawn breakfast.

Plaintiff seeks compensatory and punitive damages as relief.

## IV.

## DISCUSSION

### A.     Statement of Undisputed Facts

1.      During all times relevant to this lawsuit, Plaintiff Curtis Boyd (G-63575) was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), and incarcerated at the California Substance Abuse and Treatment Facility and State Prison – Corcoran (SATF).  (Pl.'s Compl., ECF No. 1 at 6.)[2]

2.      During all times relevant to the First Amended Complaint (FAC), Defendant Etchebehere was employed by CDCR as an Associate Warden at SATF, Complex IV.  (Decl. of C. Etchebehere, ¶ 2.)

3.      As the Associate Warden of Complex IV, Defendant was responsible for overseeing the religious programs at SATF.  (Decl. of C. Etchebehere, ¶ 3; see Decl. of F. Cote, ¶ 3.)

4.      During all times relevant to the FAC, Defendant Cote was employed by CDCR as a Community Partnership Manager (CPM) at SATF.  (Decl. of F. Cote, ¶ 2.)

---

[2] Both Plaintiff's original and first amended complaints are signed under penalty of perjury.  (ECF Nos. 1 & 47.)

5. During all times relevant to the FAC, Defendants Guembe, Hetebrink, and Ojeda were employed by CDCR as State Chaplains at SATF. (Decl. of R. Guembe, ¶ 1; Decl. of D. Hetebrink, ¶ 3; Decl. of J. Ojeda, ¶ 2.)

6. During all times relevant to the FAC, Defendants Gallagher and Odle were employed by CDCR as Correctional Lieutenants at SATF, acting in the capacity of Correctional Captains. (Decl. of J. Gallagher, ¶ 2; Decl. of B. Odle, ¶ 2.)

7. During all times relevant to the FAC, Defendant Perkins was employed by CDCR as a Correctional Food Manager II (CFM) at SATF. (Decl. of D. Perkins, ¶ 2.)

8. Plaintiff has been practicing Islam since 1979. (Decl. of A. Whisnand, Ex. A at Whisnand.009 [Pl.'s Dep. at 22:19-25].)

9. Plaintiff believes that the Quran is the divinely-inspired word of God. (Decl. of A. Whisnand, Ex. A at Whisnand.014 [Pl.'s Dep. at 28:23-25].)

10. During the time period relevant to the First Amended Complaint, Plaintiff could practice his faith by saying his five daily prayers, praying privately in his cell, or by praying with other inmates in their cells, the dayroom, or on the yard. (Decl. of A. Whisnand, Ex. A at Whisnand.010 [Pl.'s Dep. at 23:21-24:1]; see also id. at Whisnand.011 [Pl.'s Dep. at 24;3-7]; see also id. at Whisnand.013 [Pl.'s Dep. at 26:5-22]; see also id. at Whisnand.014 [Pl.'s Dep., at 28:4-11]; see also Decl. of C. Etchebehere, ¶ 43; see also Decl. of R. Guembe, ¶¶ 3-4.)

11. Plaintiff could also practice his faith by attending the Friday "Jumu'ah" congregational prayer for Muslim inmates. (Decl. of A. Whisnand, Ex. A at Whisnand.010-011 [Pl.'s Dep. at 23:21-24:2]; see also id. at Whisnand.011 [Pl.'s Dep. at 24:3-7]; see also id. at Whisnand.013 [Pl.'s Dep. at 26:5-22]; see also id. at Whisnand.014 [Pl.'s Dep. at 28:4-11]; see also Decl. of C. Etchebehere, ¶ 43; see also Decl. of R. Guembe, ¶¶ 3-4.)

12. Plaintiff attended Friday Jumu'ah prayer on a regular basis. (Decl. of A. Whisnand, Ex. A at Whisnand.013 [Pl.'s Dep. at 26:20-22]; see also id. at Whisnand.094 [Pl.'s Dep., Errata Sheet]; Decl. of R. Guembe, ¶¶ 3-4.)

13. Plaintiff could also practice his faith by fasting. (Decl. of A. Whisnand, Ex. A at Whisnand.010 [Pl.'s Dep., at 23:14-20]; see also id. at Whisnand.011 [Pl.'s Dep., at 24:3-7].)

14. Plaintiff could also practice his faith by possessing religious property, such as prayer rugs, prayer beads, ("dhikr beads"), prayer oil, religious literature, and music. (Decl. of A. Whisnand, Ex. A at Whisnand.011 [Pl.'s Dep. at 24:8-19]; see also Decl. of C. Etchebehere, ¶ 43.)

15. Plaintiff could also practice his faith by wearing religious headwear ('kufi cap'). (Decl. of A. Whisnand, Ex A at Whisnand.011 [Pl.'s Dep. at 24:20-23]; see also Decl. of C. Etchebehere, ¶ 42.)

16. Plaintiff could also practice his faith by owning and reading religious literature, including the Quran. (Decl. of A. Whisnand, Ex. A at Whisnand.012 [Pl.'s Dep. at 25:17]; see also Decl. of C. Etchebehere, ¶ 43.)

17. Plaintiff could also borrow religious books from the library or chapel. (Decl. of C. Etchebehere, ¶ 43.)

18. Plaintiff also participated in Ramadan at SATF during the three years prior to 2012. (Decl. of A. Whisnand, Ex. A at Whisnand.027 [Pl.'s Dep. at 44:14-23].)

19. In 2012, Plaintiff was able to participate in two religious festivals at SATF—the Eid ul-Adha and the Eid ul-Fitr. (Pl.'s Compl, ECF No. 1 at 17, 21-22.)

20. Plaintiff believes that certain foods are permissible for Muslims to eat ("halal") while others are prohibited ("haram").[3]

21. Generally, according to Plaintiff's religious beliefs, anything that is not strictly haram (prohibited), is halal (permissible). (Decl. of A. Whisnand, Ex. A at Whisnand.015-016 [Pl.'s Dep. at 31:22-32:7]; see also id. at Whisnand.016 [Pl.'s Dep. at 32:8-24]; see also id. at Whisnand.042 [Pl.'s Dep. at 62:6-16.)

22. According to Plaintiff's religious beliefs, foods that are haram, or prohibited, include alcohol, pork, meat that is not killed in the name of Allah, and food that is contaminated with dyes or pesticides. (Decl. of A. Whisnand, Ex. A at Whisnand.016 [Pl.'s Dep. at 32:8-24]; see also id. at Whisnand.017-018 [Pl.'s Dep. at 33:5-34:4]; see also id. at Whisnand.021-022 [Pl.'s Dep. at 37:15-38:16].)

---

[3] Plaintiff was misquoted throughout his deposition as saying "haroun," instead of "haram." See Decl. of A. Whisnand, Ex. A at Whisnand.094-098 [Pl.'s Dep., Errata Sheet].)

23.     According to Plaintiff's religious beliefs, food that was grown and sourced to be halal can be rendered haram if the person handling the food was an idol worshiper.  (Decl. of A. Whisnand. Ex. A at Whisnand.048-050 [Pl.'s Dep at 70:7-72:10].)

24.     According to Plaintiff's religious beliefs, a prison diet that was otherwise halal could become offensive to him if he learned that non-Muslim homosexuals or idol worshipers were also consuming that diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.052-053 [Pl.'s Dep at 75:15-76:6]; see also id. at Whisnand.053-054 [Pl.'s Dep. at 76:7-77:9].)

25.     According to Plaintiff's religious beliefs, Plaintiff can eat haram foods if forced by necessity to do so.  (Decl. of A. Whisnand, Ex. A at Whisnand.019 [Pl.'s Dep. at 35:1-11]; see also id. at Whisnand.022 [Pl.'s Dep. at 38:18-25].)

26.     According to Plaintiff's religious beliefs, Plaintiff can avoid the spiritual consequences of earing haram food by praying for forgiveness and repenting.  (Decl. of A. Whisnand, Ex. A at Whisnand.018 [Pl.'s Dep. at 34:21-25].)

27.     Plaintiff believes there may have been instances during his incarceration where he unknowingly consumed haram foods.  (Decl. of A. Whisnand, Ex. A at Whisnand.019-020 [Pl.'s Dep. at 35:12-36:20].)

28.     Plaintiff also believes that there may have been occasions prior to his incarceration where he unknowingly consumed haram foods.  (Decl. of A. Whisnand, Ex. A at Whisnand.020-021 [Pl.'s Dep. at 36:21-37:14].)

29.     Ramadan is an annual, month-long religious fast and celebration observed by Muslims. (Decl. of C. Etchebehere, ¶ 6; see also Decl. of A. Whisnand, Ex. A at Whisnand.023 [Pl.'s Dep at 39:4-8].)

30.     According to Plaintiff's religious beliefs, during the month of Ramadan he is required to fast from sunrise to sunset, avoid idle talk, avoid impure thoughts, and do good deeds.  (Decl. of A. Whisnand, Ex. A at Whisnand.023-24 [Pl.'s Dep at 39:4-40:11].)

31.     According to Plaintiff's religious beliefs, he is not required to break his fast with any particular food item—even water will suffice.  (Decl. of A. Whisnand, Ex. A at Whisnand.025 [Pl.'s Dep. at 41:8-18].)

32.     According to Plaintiff's religious beliefs, other than the fasting component, Ramadan does not alter Islam's religious dietary laws; during Ramadan, Plaintiff is only forbidden from eating foods that are haram.  (Decl. of A. Whisnand, Ex. A at Whisnand.025-026 [Pl.'s Dep at 41:19-42:4].)

33.     During all times relevant to the FAC, SATF had several diet programs available to inmates, including: the "mainline" or general population diet, the Jewish Kosher Diet, the Religious Meat Alternate (RMA) Program, and the vegetarian diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.035 [Pl.'s Dep. at 55:15-20].)

34.     During normal feeding programming, all inmates, regardless of their diet program, would receive two hot meals in the dining hall (breakfast and dinner) and a sack lunch, to be eaten in their cells.  (Decl. of C. Etchebehere, ¶ 8; see also Decl. of A. Whisnand, Ex. A at Whisnand.033 [Pl.'s Dep at 53:4-17].)

35.     In practice, inmates at SATF could keep items from their sack lunch in their cells. (Decl. of A. Whisnand, Ex. A at Whisnand.034-035 [Pl.'s Dep. at 54:5-55:3-; see also Decl. of C. Etchebehere, ¶ 9.)

36.     Inmates could also purchase food from SATF's canteen, such as ramen soups, beans, instant rice, candy, or cookies.  (Decl. of A. Whisnand, Ex. A at Whisnand.062-063 [Pl.'s Dep. at 90:15-91:2]; see also Decl. of C. Etchebehere, ¶ 9.)

37.     Inmates were allowed to keep items that they had purchased form the canteen in their cells.  (Decl. of C. Etchebehere, ¶ 9; see also Decl. of A. Whisnand, Ex. A at Whisnand.075 [Pl.'s Dep. at 108:3-14].)

38.     Inmates at SATF routinely shared with each other items they had purchased from the canteen.  (Decl. of C. Etchebehere, ¶ 9.)

39.     Inmates had access to water via a sink in their cells, water fountains, in the dayroom, and water fountains on the yard.  (Decl. of A. Whisnand, Ex. A at Whisnand.035 [Pl.'s Dep. at 55:4-14]; see also id. Whisnand.088 [Pl.'s Dep. at 127:12-16]; see also Decl. of C. Etchebehere, ¶ 10.)

40.     The breakfasts and dinners on the RMA diet were typically identical to the mainline diet, with the exception of the meat item (i.e., the "meat alternate").  (Decl. of A. Whisnand, Ex. A at Whisnand.059-060 [Pl's Dep. at 84:11-85:22].)

41.     The sack lunch for the RMA diet was often identical to the vegetarian diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.036-037 [Pl.'s Dep at 56:19-57:9].)

42.     Plaintiff enrolled in the RMA diet at SATF as early as July 2010.  (Decl. of A. Whisnand, Ex. A at Whisnand.055-058 [Pl.'s Dep. at 78:13-80:14]; see also id. at Whisnand.101-102 [Pl.'s Dep., Ex. 4].)

43.     Three months later, however, in October 2010, Plaintiff cancelled his RMA diet and returned to the mainline diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.058 [Pl.'s Dep. at 82:15-23]; see also id. at Whisnand.102 [Pl.'s Dep., Ex. 4]; see id. at Whisnand.061 [Pl.'s Dep at 87:3-12].)

44.     Plaintiff cancelled his RMA diet because he could not be certain that the RMA diet was halal: he could not verify how the food was handled or processed.  (Decl. of A. Whisnand, Ex. A at Whisnand.038-039 [Pl.'s Dep. at 58:23-59:18]; see also id. at Whisnand.039-041 [Pl.'s Dep. at 59:19-61:1]; see also id. at Whisnand.043-044 [Pl.'s Dep. at 65:25-66:19].)

45.     From October 2010 through September 2011, Plaintiff was enrolled in the mainline diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.061 [Pl.'s Dep. at 87:3-12].)

46.     In September 2011, Plaintiff applied for the vegetarian diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.061 [Pl.'s Dep. at 87:3-12]; see also id. at Whisnand.045-046 [Pl.'s Dep. at 67:4-68:2].)

47.     As was true with the RMA diet, Plaintiff could not be sure that the vegetarian diet was halal, because he could not verify whether the food was prepared or handled correctly.  (Decl. of A. Whisnand, Ex. A at Whisnand.041 [Pl.'s Dep. at 61:5-16]; see also id. at Whisnand.045-046 [Pl.'s Dep. at 67:4-68:2].)

48.     For the same reasons, Plaintiff could not be sure that any of the diets at SATF were either halal or haram, because he could not verify how the foods were handled and processed.  (Decl. of A. Whisnand, Ex. A at Whisnand.046 [Pl.'s Dep. at 68:5-17]; see also id. at Whisnand.046-047 [Pl.'s dep. at 68:18-69:24]; see also id. at Whisnand.047-048 [Pl.'s Dep. at 69:25-70:6].)

49.     In the prison context, it would be extremely difficult to ensure that every aspect of a prison diet—from the sourcing of the food, to processing, packaging, handling, preparing, and

serving—was completely halal.  (Decl. of A. Whisnand, Ex. A at Whisnand.046-047 [Pl.'s Dep. at 68:18-69:24].)

50.　　Prior to the start of Ramadan in July 2012, Plaintiff remained enrolled in the vegetarian diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.041 [Pl.'s Dep. at 61:2-4].)

51.　　As the Associate Warden overseeing religious programs in 2012, Defendant Etchebehere was responsible for coordinating the observance of Ramadan at SATF during the time period relevant to the FAC.  (Decl. of C. Etchebehere, ¶ 5.)

52.　　Typically, a Community Partnership Manager (CPM) would oversee the religious program at SATF, but because the CPM did not start work until May 2012, the primary responsibility for overseeing religious programs fell to Defendant Etchebehere.  (Decl. of C. Etchebehere, ¶ 4; see also Decl. of F. Cote, ¶ 3.)

53.　　Custody staff members, like Defendant Etchebehere, did not typically administer religious programs.  (Decl. of C. Etchebehere, ¶ 4.)

54.　　In 2012, Ramadan was observed at SATF beginning on the evening of July 19, 2012, and ending on August 18, 2012.  (Decl. of C. Etchebehere, ¶ 6; see also Decl. of A. Whisnand, Ex. A at Whisnand.071-072 [Pl.'s Dep at 101:24-102:2]; see also Decl. of J. Ojeda, ¶ 3; see also Decl. of D. Perkins, ¶ 3.)

55.　　In the years prior to 2012, Ramadan at SATF followed a basic framework: Inmates who had been verified as Muslims were released to the dining halls after sunset on each night of Ramadan. At the dining halls, the Muslim inmates would receive an evening meal and a sack "breakfast" to eat in their cells before sunrise (i.e., the "Suhoor" meal).  (Decl. of C. Etchebehere, ¶ 7; see also Decl. of A. Whisnand, Ex. A at Whisnand.031-032 [Pl.'s Dep., at pp. 50:7-51:11].)

56.　　Inmates not participating in Ramadan remained on the normal feeding schedule and program: these inmates received a hot breakfast in the dining hall, a sack lunch to take back to their cells, and a hot dinner in the dining hall.  (Decl. of C. Etchebehere, ¶ 8; Decl. of A. Whisnand, Ex. A at Whisnand.033-034 [Pl.'s Dep. at 53:4-54:4].)

57.　　In the years prior to 2012, Ramadan at SATF followed a basic framework: Inmates who had been verified as Muslims were released to the dining halls after sunset on each night of Ramadan.

At the dining halls, the Muslim inmates would receive an evening meal and a sack "breakfast" to eat in their cells before sunrise (i.e., the "Suhoor" meal). (Decl. of C. Etchebehere, ¶ 7; see also Decl. of A. Whisnand, Ex. A at Whisnand.031-032 [Pl's Dep. at 50:7-51:11].)

58.     During the planning process for Ramadan in 2012, SATF's Muslim Chaplain position was vacant. (Decl. of C. Etchebehere, ¶ 12; see also Decl. of R. Guembe, ¶ 6; see also Decl of J. Ojeda, ¶ 4; see also Decl. of D. Hetebrink, ¶ 4; see also Decl. of F. Cote, ¶ 4; see also Decl. of D. Perkins, ¶ 5.)

59.     Although SATF was in the process of hiring a Muslim Chaplain, Defendant Etchebehere and her staff had to have a plan in place for Ramadan by no later than the middle of June 2012. (Decl. of C. Etchebehere, ¶ 14.)

60.     Prior to 2012, Defendants Etchebehere and Cote had never planned for Ramadan at SATF or any other CDCR institution. (Decl. of C. Etchebehere, ¶ 15; Decl. of F. Cote, ¶ 6.)

61.     Defendant Etchebehere proposed to use the RMA diet list as a starting point for identifying the Muslim inmates who were eligible to participate in Ramadan. (Decl. of C. Etchebehere, ¶ 18; see also Decl. of R. Guembe, ¶ 9; Decl. of J. Ojeda, ¶ 7; Decl. of D. Hetebrink, ¶ 5; Decl. of F. Cote, ¶ 7.

62.     This proposal was discussed at a meeting at SATF on June 18, 2012. (Decl. of C. Etchebehere, ¶ 19; see also Decl. of J. Ojeda, ¶ 8; see also Decl. of F. Cote, ¶ 8; see also Decl. of B. Odle, ¶ 4; see also Decl. of J. Gallagher, ¶ 3; see also Decl. of D. Perkins, ¶ 10; see also Decl. of R. Guembe, ¶ 10.)

63.     Only Defendants Etchebehere, Cote, Ojeda, Gallagher, Odle, and Perkins were present for the June 18, 2012, Ramadan meeting. (Id.)

64.     Defendant Hetebrink was not present for the June 18, 2012, Ramadan meeting. (Decl. of D. Hetebrink, ¶ 6; see also Decl. of A. Whisnand, Ex. A at Whisnand.083 [Pl's Dep. at 122:21-23]; see also id. at Whisnand.132 [Pl.'s Dep., Ex. 8].)

65.     Defendant Guembe was also not present for the June 18, 2012, Ramadan meeting. (Decl. of R. Guembe, ¶ 10; see also Decl. of A. Whisnand, Ex. A at Whisnand.083-084 [Pl.'s Dep. at 122:24-123:4]; see also id. at Whisnand.132 [Pl.'s Dep., Ex. 8].)

66.     At the time of the June 18, 2012, meeting, SATF was in the process of hiring a Muslim Chaplain, A. Haroun.  (Decl. of C. Etchebehere, ¶ 20.)

67.     Chaplain Haroun was not scheduled to start work until July 2, 2012.  (Decl. of C. Etchebehere, ¶ 20; see also Decl. of A. Whisnand, Ex. A at Whisnand.092-093 [Pl.'s Dep. at 130:23-131:11].)

68.     There were between approximately 3,500 and 4,000 inmates across seven facilities at SATF in July 2012.  (Decl. of C. Etchebehere, ¶ 41.)

69.      The Ramadan policy was adopted in a memorandum entitled "Ramadan," dated July 11, 2012.  (Decl. of. C. Etchebehere, ¶ 26.)

70.      July 11, 2012 was the first day that Muslim Chaplain Haroun was able to orient himself and meet the inmates and staff on each of SATF's facilities.  (Decl. of C. Etchebehere, ¶ 29.)

71.     On July 11, 2012, Defendant Etchebehere circulated the memorandum for approval and signature by Defendant Perkins (CFM), Defendant Cote (CPM), the Facility Captains, including Defendants Gallagher and Odle, the Associate Wardens, and the Warden.  (Decl. of C. Etchebehere, ¶ 28.)

72.     Defendant Hetebrink did not sign the July 11, 2012, Ramadan memorandum.  (Decl. of D. Heterbrink, ¶ 8; see also Decl. of C. Etchebehere, Ex. E at Etchebehere.014-018.)

73.     Defendant Guembe did not sign the July 11, 2012, Ramadan memorandum.  (Decl. of R. Guembe, ¶ 14.)

74.     Defendant Ojeda did not sign the July 11, 2012, Ramadan memorandum.  (Decl. of J. Ojeda, ¶ 11.)

75.     On July 16, 2012, the office of the Chief Deputy Warden circulated the final, signed copy of the July 11, 2012, memorandum to the Facility Captains, the Associate Wardens, CFM Perkins, and CPM Cote.  (Decl. of C. Etchebehere, ¶ 30.)

76.     Defendant Etchebehere also forwarded the final memorandum to SATF's Chaplains to ensure that they would notify the inmates on their assigned yards.  (Decl. of C. Etchebehere, ¶ 31.)

77.     Defendant Etchebehere also personally instructed custody staff members to inform inmates wishing to participate in Ramadan to contact Chaplain Haroun as soon as possible to confirm their eligibility.  (Decl. of C. Etchebehere, ¶ 32.)

78.     Plaintiff received a copy of the July 11, 2012, memorandum by July 19, 2012, at the latest.  (Decl. of A. Whisnand, Ex. A at Whisnand.068-069 [Pl.'s Dep. at 98:17-99:21]; see also id. at Whisnand.115-117 [Pl.'s Dep., Ex. 6]; see also id. at Whisnand.065-066 [Pl.'s Dep. at 93:24-94:22]; see also id. at Whisnand.067 [Pl.'s Dep. at 96:3-14].)

79.     Plaintiff understood that the memorandum instructed that he must be enrolled in the RMA diet in order to participate in Ramadan.  (Decl. of A. Whisnand, Ex. A at Whisnand.070-071 [Pl.'s Dep. at 100:1-101:8]; see also Pl.'s Compl., ECF No. 1 at 7, ¶ 11.)

80.     Plaintiff protested the policy to use the RMA diet list as the criteria for Ramadan eligibility, because he was concerned that non-Muslims would be ducated for Ramadan.  (Decl. of A. Whisnand, Ex. A at Whisnand.051-052 [Pl.'s Dep. at 74:12-75:14]; see also id. at Whisnand.051-052 [Pl.'s Dep. at 76:11-77:9]; see also Pl.'s First Am. Compl., ECF No. 47 at 4 ["Defendants … then FORCED plaintiff … to enroll in and participate in the Religious Meal Alternative program with non-Muslims…."].)

81.     Plaintiff's fear—that non-Muslims would participate in Ramadan because their names appeared on the RMA list—never materialized.  (Decl. of A. Whisnand, Ex. A at Whisnand.054-055 [Pl.'s Dep. at 77:14-78:12].)

82.     Beginning on July 19, 2012, and continuing through the first week of Ramadan, it came to Defendant Etchebehere's attention that there were a few Muslim inmates—the majority of whom were on the vegetarian diet—who were not initially identified to receive their Ramadan meals.  (Decl. of C. Etchebehere, ¶ 34.)

83.     Plaintiff claims that from July 19, 2012, through July 25, 2012, he was denied entry to the dining halls to receive his Ramadan meals.  (Decl. of A. Whisnand, Ex. A at Whisnand.074 [Pl.'s Dep. at 107:15-18]; see also id. at Whisnand.081 [Pl.'s Dep. at 119:7-14].)

84.     On July 19, 2012—the first day of Ramadan—Plaintiff was still enrolled in the vegetarian diet.  (Decl. of A. Whisnand, Ex. A at Whisnand.041 [Pl.'s Dep. at 61:2-4].)

13

85.     Plaintiff did not sign up for the RMA diet until Saturday, July 21, 2012, by submitting his Religious Diet Request Form to Defendant Guembe.  (Decl. of R. Guembe, ¶ 12; <u>see also</u> Whisnand, Ex. A at Whisnand.074 [Pl.'s Dep at 107:8-18]; <u>see also id.</u> Whisnand.077 [Pl.'s Dep. at 114:14-20].)

86.     At the time he submitted his RMA request, Plaintiff knew that it would likely take a couple of days for his request to be approved, and for his name to be added to the Ramadan participation list.  (Decl. of A. Whisnand, Ex. A at Whisnand.077 [Pl.'s Dep. at 114:21-25]; <u>see also id.</u> at Whisnand.078 [Pl.'s Dep. at 115:10-15].)

87.     Plaintiff did not submit an inmate grievance concerning his missed Ramadan meals until July 22, 2012, the fourth day of Ramadan.  (Decl. of A. Whisnand, Ex. A at Whisnand.079-080 [Pl.'s Dep. at 116:1-117:8]; <u>see also id.</u> at Whisnand.121 [Pl.'s Dep., Ex. 7].)

88.     With the exception of contacting Defendant Guembe on July 19, 2012 and July 21, 2012, Plaintiff did not contact Defendants concerning the 2012 Ramadan policy.  (Decl. of A. Whisnand, Ex. A at Whisnand.114-115 [Pl.'s Dep. at 113:21-114:10-13]; <u>see also id.</u> at Whisnand.082-083 [Pl.'s Dep. at 119:24-120:9]; <u>see also id.</u> at Whisnand.007-008 [Pl.'s Dep. at 10:16-11:14]; <u>see also</u> Decl. of C. Etchebehere, ¶ 39.)

89.     Plaintiff was able to receive his Ramadan meals and participate in the remainder of Ramadan beginning on July 26, 2012.  (Decl. of A. Whisnand, Ex. A at Whisnand.081 [Pl.'s Dep. at 119:7-14].)

90.     Beginning the second week of Ramadan in 2012, the Muslim inmates were also afforded an additional thirty minutes of prayer time before their evening meal.  Defendant helped coordinate this accommodation.  (Decl. of C. Etchebehere, ¶ 44.)

91.     Throughout the period during which Plaintiff claims he was not receiving his Ramadan meals, Plaintiff consumed items he had purchased from the canteen a week before Ramadan.  (Decl. of A. Whisnand, Ex. A at Whisnand.063-064 [Pl.'s Dep. at 91:3-92:24]; <u>see also</u> id. at Whisnand.113 [Pl.'s Dep., Ex. 5]; <u>see also id.</u> at Whisnand.075 [Pl.'s Dep. at 108:3-20]; see also id. at Whisnand.087-088 [Pl.'s Dep. at 126:22-127:11]; <u>see also id.</u> at Whisnand.088-089 [Pl.'s Dep. at 127:17-128:18].)

92.     Plaintiff did not ask any other inmates for food during the time period he claims he went without his Ramadan meals.  (Decl. of A. Whisnand, Ex. A at Whisnand.089-090 [Pl.'s Dep. at 128:24-129:2].)

93.     Plaintiff did not seek medical attention during the period of July 19, 2012, through July 25, 2012.  (Decl. of A. Whisnand, Ex. A at Whisnand.091 [Pl.'s Dep. at 130:6-22].)

**B.     Findings on Defendants' Motion**

As previously stated, Plaintiff contends that his rights to the free exercise of his religion were violated by a prison policy that required him to enroll in a "halal" diet to receive meals and participate in the month of Ramadan.  At the time, Plaintiff was on a vegetarian diet, and was not initially identified for Ramadan, and missed up to seven meals.

Defendants move for summary judgment because: (1) Plaintiff's religious rights were not substantially burdened by way of the 2012 Ramadan policy; (2) even if Plaintiff's religious rights were substantially burdened, using the RMA list was objectively reasonable under the circumstances, and was rationally related to legitimate penological interests; (3) with respect to Defendants Guembe, Hetebrink , Cote, Odle, and Gallagher, the undisputed evidence shows that they did not play a substantial role in adopting the Ramadan policy at issue in this suit; and (4) the undisputed evidence show that Defendants are entitled to qualified immunity.

1.     <u>Substantial Burden by way of the 2012 Ramadan Policy</u>

Defendants argue that requiring Plaintiff to enroll in the RMA diet in order to participate in Ramadan did not substantially burden his religious rights.

"[P]risoners retain the protections of the First Amendment" but their "right to freely exercise [their] religion is limited by institutional objectives and by the loss of freedom concomitant with incarceration."  <u>Hartmann v. California Dep't of Corr. & Rehab.</u>, 707 F.3d 1114, 1122 (9th Cir. 2013) (citing <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400 (1997)).  The protections of the Free Exercise Clause are triggered when prison officials substantially burden the practice of an inmate's religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith, but an impingement on an inmate's constitutional rights will be upheld "'if it is reasonably related to legitimate penological interests.'"  <u>Shakur v. Schriro</u>, 514 F.3d 878, 884-85

(9th Cir. 2008) (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).  Courts apply a four-part test to balance the inmate's free exercise right against the state's legitimate penological interests to determine if a regulation is reasonable and constitutional.  <u>Turner</u>, 482 U.S. at 89.

The Ninth Circuit has recently explained:

> A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion.  A substantial burden…places more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs…. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has directed that alleged infringements of prisoners' free exercise rights be judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  The challenged conduct is valid if it is reasonably related to legitimate penological interests.

<u>Jones v. Williams</u>, 791 F.3d 1023, 1031-32 (9th Cir. 2015) (internal quotations and citations omitted).  "It was well established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs."  <u>Id.</u> at 1033.

It is undisputed that Plaintiff was enrolled in the RMA diet for a period of approximately four months in 2010.  (UMF[4] No. 42.)  There were similarities between the RMA diet and the mainline diet and between the RMA diet and the vegetarian diet.  (UMF Nos. 45-46.)  Indeed, Plaintiff has enrolled in both the mainline diet and the vegetarian diet at SATF.  (UMF Nos. 43, 45, 46, 50.)  Further, Plaintiff's religious beliefs do not require him to eat certain foods during Ramadan.  (UMF Nos. 31-32.)  Moreover, although Plaintiff claims that he cannot be sure that the RMA diet is actually halal (UMF No. 44), such claim is speculative.  Plaintiff acknowledged that he cannot be sure that any of SATF's diets are strictly halal (UMF Nos. 47-49), and nothing has prevented him from enrolling in each of SATF's diets during his incarceration (UMF Nos. 42, 43, 46).  There is no evidence before the Court to suggest that the food provided by the RMA diet would be impermissible for purposes of breaking Plaintiff's fast each night of Ramadan.  (UMF Nos. 31-32.)

---

[4] "UMF" refers to the Statement of Undisputed Facts set forth in section IV(A) herein.

Based on the undisputed facts and evidence before the Court, requiring Plaintiff to enroll in the RMA diet was not a substantial burden on Plaintiff's religious rights. Alternatively, even assuming that enrollment in the RMA posed a substantial burden on Plaintiff's religious practices, Defendants are entitled to summary judgment because the RMA was reasonably related to legitimate penological interests.

### 2. Analysis of Turner Factors

Defendants argue that the 2012 Ramadan policy was reasonably related to legitimate institutional interests: to simplify the Ramadan process and to reduce administrative burdens.

"'When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" Shakur, 514 F.3d at 884 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). In Turner, the Supreme Court articulated four factors to consider in determining whether a prison regulation is valid:

> (1) Whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it";
>
> (2) Whether there are "alternative means of exercising the right that remain open to prison inmates";
>
> (3) Whether "accommodation of the asserted constitutional right" will "impact … guards and other inmates, and on the allocation of prison resources generally"; and
>
> (4) Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

Shakur, 514 F.3d at 882 (citing Turner, 482 U.S. at 89-90.)

### a. First Turner Factor

In considering the first Turner factor, the court must "(1) determine whether the regulation is legitimate and neutral, and (2) assess whether there is a rational relationship between the governmental objective and the regulation." Ashker, 350 F.3d at 922. The "orderly administration of a program that allows … prisons to accommodate the religious dietary needs of thousands of prisoners" is a legitimate governmental interest. Resnick v. Adams, 348 F.3d 763, 769 (9th Cir. 2003).

Defendants argue that the 2012 Ramadan policy was a reasonable method to reduce administrative burdens for Defendants, custody staff, Food Services, the inmates, and Chaplain

1   Haroun.  (Decl. of C. Etchebehere, ¶¶ 22-25, 40-41; <u>see also</u> Decl. of D. Perkins, ¶¶ 12-13.)

2   Defendants specifically submit that at the time in question, there was not a Muslim chaplain at SATF

3   and it was determined that using the RMA list was the most efficient method to identify the majority

4   of Muslim inmates in a short period of time.  (Decl. of C. Etchebehere, ¶¶ 21, 41; see also Decl. of R.

5   Guembe, ¶ 11; Decl. of J. Ojeda, ¶ 9; Decl. of D. Perkins, ¶¶ 12-13.)  Because the RMA contained a

6   halal diet, Defendants reasonably assumed that most of SATF's Muslim inmates were either already

7   enrolled in the RMA, or would do so quickly after learning of the Ramadan policy.  (Decl. of C.

8   Etchebehere, ¶¶ 18-19, 21; Decl. R. Guembe, ¶ 11; Decl. of J. Ojeda, ¶ 7; Decl. of D. Perkins, ¶ 9;

9   Decl. of A. Whisnand, Ex. A at Whisnand.070-071 [Pl.'s Dep., at pp. 100:7-101:8; Cal. Code Regs. tit.

10  15, § 3054.3 (2012).)  In order to reduce the administrative burden on custody staff, one definitive list

11  would prevent staff from being burdened with additional last minutes requests, which had taken place

12  in prior years.  (Decl. of C. Etchebehere, ¶¶ 13, 22-25, 40-41;  Decl. of D. Perkins, ¶¶ 7-8, 12-13.)  In

13  addition, it would prevent food services from having to prepare multiple types of meal trays for

14  Ramadan and prevent scrambling at the last minute.  (Decl. of C. Etchebehere, ¶ 25; Decl. of D.

15  Perkins, ¶ 8.)  To participate in Ramadan, it only required the Muslim who were not already on the

16  RMA diet to submit a religious diet request form to any chaplain.  (Decl. of C. Etchebehere, ¶ 23.)  To

17  facilitate reducing the administrative burden on the new Muslim chaplain (who could not meet with

18  the Muslim inmates until July 11, 2012) using the RMA list as the starting point prevented having to

19  create a list of the Muslim inmates from scratch.  (Decl. of C. Etchebehere, ¶¶ 20, 29.)

20          Defendants have presented sufficient evidence to demonstrate that the 2012 Ramadan policy

21  was a reasonable method to reduce administrative burdens for Defendants, custody staff, Food

22  Services, the inmates, and Chaplain Haroun.  There is a valid rational connection between prison

23  officials' interest in a simplified, orderly and cost-efficient food system and the 2012 Ramadan policy

24  was a reasonable method to reduce administrative burdens to all parties involved.  <u>Resnick v. Adams</u>,

25  348 F.3d at 769.

26          Considering the evidence of the circumstances surrounding the regulation, this factor weighs in

27  favor of Defendants in serving a legitimate and neutral penological objective.

28  ///

### b.  Second Turner Factor

The second <u>Turner</u> factor considers "not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, ... whether the inmates have been denied all means of religious express." <u>Ward v. Walsh</u>, 1 F.3d 873, 877-78 (9th Cir. 1993) (citing <u>O'Lone</u>, 482 U.S. at 351-52).

An inmate who has "'alternative means by which he can practice his religion'" has not been deprived of all means of religious expression. <u>Shakur</u>, 514 F.3d at 886 (citing <u>Ward</u>, 1 F.3d at 877) (Muslim inmate who did not receive a Kosher diet not deprived of all means of religious expression where he could possess a Quran, prayer rug, and religious items, could visit an imam upon request, and could participate in various rituals and ceremonies); <u>Boyd v. Lehman</u>, No. C 05-0020-JLR, 2006 WL 1442201, at *6 (W.D. Wash. May 19, 2006) (same, where Muslim inmate could not receive halal meats, but could receive a halal vegetarian diet, could attend two religious holidays per year, could participate in five daily prayers, could fast during Ramadan, and could visit a Muslim chaplain; <u>see also</u> <u>O'Lone</u>, 482 U.S. at 351-52 (same, where Muslim inmate could not attend weekly Jumu'ah prayer during working hours, but could congregate for prayer when not at work, could access a Muslim imam, could eat a religious diet, and could observe Ramadan).

In this instance, Plaintiff had various different ways to practice his faith, including: praying his five daily prayers, praying privately in his cell, or praying with other inmates in their cells, the dayroom, or on the yard (UMF No. 10); regularly attending the Friday "Jumu'ah" congregational prayer for Muslim inmates (UMF Nos. 11-12); fasting (UMF No. 13); possessing religious property, such as prayer rugs, prayer beads ("dhikr beads"), prayer oil, religious literature, and music (UMF No. 14); wearing religious headwear ("kufi cap") (UMF No. 15); owning and reading religious literature, including the Quran (UMF No. 16); borrowing religious books from the library or chapel (UMF No. 17); participating in Ramadan during the three years prior to 2012 (UMF No. 18); and, in 20120, participating in two religious festivals (UMF No. 19).

Although it is undisputed that Plaintiff did not receive Ramadan meals for seven days, it is also undisputed that Plaintiff had various other alternative avenues to practice his religion, and this factor weighs in favor of Defendants.

c.      **Third Turner Factor**

The third consideration is to determine the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. <u>Turner</u>, 482 U.S. at 90. "When an accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." <u>Id.</u>

Here, Defendants assert that proceeding without a definitive list of Ramadan participants—such as the one intended here—would have placed an undue burden on custody staff and food services. With respect to food services, Defendants argue although there would have been little cost difference in providing a vegetarian meal to Plaintiff during Ramadan, there would have been a burden on food services if they had to prepare different types of meals for Ramadan. With regard to custody staff, Defendants argue that instead of focusing on maintaining the security of the dining halls, officers would have had to contend with inmates demanding to participate at the last minute, which was a documented problem in prior years.

There is insufficient evidence before the Court to determine the third <u>Turner</u> factor that requiring enrollment in the RMA would have a marked effect on CDCR. Defendants merely speculate as to a "ripple effect," and there is insufficient evidence to support such assertion. However, it is questionable whether this factor is even applicable because Plaintiff was ultimately accommodated, and to the extent this factor applies to the seven day delay in receiving Ramadan meals, the delay was reasonable given that Plaintiff was not enrolled in the RMA diet and staff had to process and implement his request. (Pl.'s Dep. at 107, 11-114.) Nonetheless, this factor weighs in favor of Plaintiff.

d.      **Fourth Turner Factor**

As to the fourth Turner factor, the Court determines whether the regulation is an "exaggerated response" to the prison's concerns. <u>Turner</u>, 482 U.S. at 90-91. "The burden is on the prisoner challenging the regulation to show that there are obvious, easy alternatives to the regulation." <u>Chau v. Young</u>, No. C 13-764 SI (PR), 2014 WL 4100635, *6 (N.D. Cal. Aug. 20, 2014) (citing <u>O'Lone</u>, 482 U.S. at 350). This determination is "not a 'least restrictive alternative' test: prison officials do not

20

have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner, 482 U.S. at 91. Rather, the relative inquiry is "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton v. Bazzetta, 539 U.S. 126, 135-36 (2003).

Defendants submit that without the assistance of a Muslim chaplain, with limited experience in planning for Ramadan, and without any institutional guidelines to follow, Defendants needed a way to quickly identify the majority of the Muslim inmates for Ramadan.

In his opposition, Plaintiff claims, without evidentiary support, that "the less restrictive choice was [to use] the Friday Jumah prayer list" to identify inmates for Ramadan, because it was "the most comprehensive listing of Muslim inmates at SATF…." (ECF No. 101 at 9.) However, the determination of whether the Friday Jumah prayer list was the "less restrictive choice" is not dispositive. See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. at 349 (under Turner factors, the prison officials are not required to "set up and shoot down every conceivable alternative method…."). Defendants submit that such method was too administratively burdensome, and using the RMA list as a starting point was the most efficient approach that Defendants could employ under the circumstances. Defendant Etchebehere declares that "[b]eginning as early as May 2012, Chaplain Ojeda, Chaplain Guembe, Chaplain Hetebrink, Correctional Food Manager (CFM) Perkins, and I started the process of planning for Ramadan. Early on in the planning process, however, we encountered difficulties identifying the Muslim inmates who could participate in Ramadan. I was informed that, in the years prior to my arrival, the preferred approach was to have the Muslim Chaplain prepare the list of the Muslim inmates who would participate in Ramadan. But during the planning process for Ramadan, SATF's Muslim Chaplain position was vacant. (I was informed that the previous Muslim Chaplain left SATF in 2010.) Without a Muslim Chaplain, we did not have an efficient method to identify which inmates would be eligible to participate in Ramadan. I do not recall if I learned how SATF prepared for Ramadan without a Muslim Chaplain prior to my assignment as Associate Warden. However, I do recall discussing with my staff that the method used in prior years was administratively burdensome. In 2011, officers were calling in at the last minute with inmates'

requests to be added to the list, causing a burden on custody staff and food services." (Decl. of C. Etchebehere, ¶¶ 11-13; see also Decl. of J. Ojeda, ¶¶ 4-7.)

Defendant D. Perkins (CFM) further declares that without a Muslim Chaplain there was not an efficient and cost-effective way to prepare for Ramadan. (Decl. of D. Perkins, ¶ 6.) Further, "[i]n the preceding years, SATF had used the attendance rolls from the Muslim services as the starting point for identifying the inmates who would participate in Ramadan. Typically, an inmate representative from each facility would work with the State Chaplain assigned to their facility to prepare a 'ducat' list. SATF took this approach primarily because there was no Muslim Chaplain to help assemble the Ramadan list. Moreover, this method was inefficient, and put an undue burden on food services. In 2011, custody staff members were calling in at the last minute to have inmates added to the list. This presented a host of problems for [f]ood [s]ervices. My line staff would feel pressured by custody staff—sometimes higher ranking staff, such as lieutenants—to try to accommodate these inmates, but there simply were not resources to do so. The food for Ramadan was often prepared ahead of time, and the kitchens would be closed by the time the sun had set. There simply was not enough food to add inmates to the list at the last minute. Moreover, oftentimes a portion of the sack meal that the Muslim inmates received was comprised of donated food items: [f]ood [s]ervices had to apportion these items amongst the participants, and there were no extra items to accommodate inmates added late. Lastly, the meals for Ramadan were oftentimes prepared in one location in the institution, and then sent to another location. Adding inmates at the last minute would burden my staff by forcing them to make separate food deliveries—assuming there was even food for additional inmates. For all of these reasons, it was critical that [f]ood [s]ervices had as comprehensive of a list as possible for each night of Ramadan, so that inmates were not being added at the last minute." (Decl. of D. Perkins, ¶¶ 7-8.)

Plaintiff also argues that "Defendants … knew from the on[]set that the RMA list would not identify all the Muslim inmates at SATF that wanted to participate in the 2012 Ramadan fast." (ECF No. 101 at 4.) However, Defendant Etchebehere declares that after speaking with SATF's Chaplains, it was her understanding that most of SATF's Muslim inmates participated in the RMA diet, and she therefore proposed to use the RMA diet list as a starting point for identifying the Muslim inmates who

were eligible to participate in Ramadan. (Decl. of C. Etchebehere, ¶¶ 18-20; Decl. of R. Guembe, ¶ 11; Decl. of J. Ojeda, ¶ 7.) Plaintiff further argues that Defendant Etchebehere should have known how the institution had identified inmates for Ramadan in prior years. (ECF No. 101 at 4.) However, Defendant Etchebehere was informed that using the Jumah prayer list was too administrative burdensome. (Decl. of C. Etchebehere, ¶¶ 12-13, 24-25; Decl. of D. Perkins, ¶¶ 5-8; Decl. of R. Guembe, ¶¶ 6, 8; Decl. of J. Ojeda, ¶¶ 4, 6; Decl. of D. Hetebrink, ¶ 4; Decl. of F. Cote, ¶ 4.)

Plaintiff further argues that the Muslim Chaplain did not have the authority to add inmates to the Ramadan list, and cites a July 18, 2012, memorandum which states: "Only those Muslim inmates approved on the halal meal list as of the day before Ramadan (July 18, 2012) will be allowed to participate. There will be no additions after this date …." (ECF No. 101 at 9; ECF No. 84-4 at 117.) However, Plaintiff overlooks the fact that Defendant Etchebehere told prison staff that the Muslim Chaplain had the authority to add inmates to the list, and the Chaplain in fact added inmates to the list, including Plaintiff, even after Ramadan had begun. (Decl. of C. Etchebehere, ¶¶ 20, 27; Decl. of D. Perkins, ¶ 11; Decl. of A. Whisnand, Ex. A at Whisnand.081 [Pl.'s Dep., at p. 119:7-14].)

Given the evidence submitted by Defendants, there was not an easy and obvious ready alternative "that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton v. Bazzetta, 539 U.S. 126, 135-36 (2003). It is undisputed that use of the Friday Jumah prayer list caused administrative problems in the past and Defendants employed the most efficient approach feasible at that time in 2012, because it was not realistic to wait until the Muslim Chaplain started to attempt to identify the Muslim inmates. In addition, it is immaterial as to who informed Defendants Etchebehere and Perkins of the issue. Accordingly, this factor weighs in favor of Defendant.

On balance and consideration, although the third Turner factor weighs slightly in Plaintiff's factor, it does not outweigh the other three Turner factors in favor of Defendants, and Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

///

///

///

3.    Defendants Guembe, Hetebrink, Cote, Odle and Gallagher

Defendants Guembe, Hetebrink, Cote, Odle and Gallagher argue that they did not play a major or substantial role in proposing or adopting the 2012 Ramadan policy, and therefore did not cause the alleged constitutional harm to Plaintiff.

Absent a more fully developed record as to the duties and responsibilities of these Defendants and their role in considering and developing a plan for the 2012 Ramadan policy, including the degree of their participation in gathering information, making suggestions and attending various meetings and/or off-record discussions where the 2012 Ramadan policy was considered by prison officials, the undersigned cannot conclude that they are entitled to summary judgment in their favor on this basis.

4.    Qualified Immunity

Defendants argue in the alternative that no constitutional violation occurred because Plaintiff's religious rights were not substantially burdened by missing a short period of Ramadan meals, and because the Ramadan policy was reasonably related to legitimate institutional interests.  The Court agrees.

Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Mullenix v. Luna, 136 S.Ct. 305, 308 (2015).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood what he is doing violates that right.'"  Mullenix, 136 S.Ct. at 308 (quoting Reichle v. Howards, 132 S.Ct. 2088, 2093 (2012)).

The Supreme Court recently cautioned that, when conducting an inquiry into qualified immunity, courts should not define clearly established law at a high level of generality.  Mullenix, 136 S.Ct. at 308.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (emphasis in original).  "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general

24

proposition.'" Mullenix, 136 S.Ct. at 308 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

Although it is beyond dispute that "[i]nmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion," McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987); see also Ward, 1 F.3d at 877, the dispositive determination is 'whether the violative nature of *particular* conduct is clearly established.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (emphasis in original). Plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the alleged impermissible conduct. See Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).

Here, a reasonable prison official would have believed it was unlawful to require a Muslim inmate to participate in the RMA diet, or "halal" diet, in order to receive Ramadan meals and participate in Ramadan activities. Defendants have submitted evidence that the RMA diet served "meat that has been certified as halal," and a majority of SATF's Muslim inmates were enrolled in the diet, and a reasonable officer would have therefore understood that the RMA diet was designed to accommodate Muslims, not to burden them. It was reasonable for Defendants to believe that most, if not all, of the Muslim inmates at SATF were already on the RMA diet, or would quickly enroll upon

learning of the policy. (Decl. of C. Etchebehere, ¶ 21.) In addition, a reasonable official would have believed that the steps that Defendant Etchebehere took to circulate the policy were appropriate. (Decl. of C. Etchebehere, ¶¶ 26-32.) Accordingly, under these circumstances, reasonable prison officials would have believed that they were not violating Plaintiff's clearly established religious rights, and Defendants are entitled to qualified immunity.

### C.    Plaintiff's Request for Sanctions

Concurrently with his opposition to Defendants' motion for summary judgment, Plaintiff moves for sanctions and for an order holding Defendants and their counsel in contempt of court. In support of his request, Plaintiff cites to several alleged instances of misconduct, fraud, and discovery abuses. For the reasons explained below, Plaintiff's request for sanctions should be denied.

#### 1.    Discrepancy Between Defendant Etchebehere's Answer and Summary Judgment Declaration

Plaintiff claims that there is a discrepancy between Defendant Etchebehere's answer and her summary judgment declaration. In her answer, Defendant Etchebehere stated that she "was no responsible for arranging and providing for meals" for Ramadan (ECF No. 12 at 9, ¶ 24), and in her declaration in support of the summary judgment motion she stated, "I was responsible for coordinating and accommodations for Ramadan[,]" (ECF No. 84-5.) Contrary to Plaintiff's argument, these two statements are not contradictory. It is possible for Defendant Etchebehere to be responsible for the overall oversight of Ramadan, but still not be personally responsible for coordinating food for Ramadan. To this end, Correctional Food Manager, Defendant Perkins, declared the she was responsible for coordinating meals. (ECF No. 84-11.)

#### 2.    Defendant Etchebehere's Affirmative Defense Regarding Third-Party Liability

Plaintiff contends that Defendant Etchebehere initially raised the affirmative defense of third-party liability in her answer and denied authoring the 2012 Ramadan memorandum, yet according to the Ramadan committee meeting minutes, it was her decision to require the use of the RMA list as a requirement for enrollment in the Ramadan fast. Plaintiff fails to demonstrate how this affirmative defense is not applicable, particularly since Defendant Etchebehere argues she was not aware that Plaintiff was not receiving his Ramadan meals. (ECF No. 84-3 at 16.)

3. <u>Defendant Etchebehere's Assistance in Drafting the July 11, 2012, Ramadan Memorandum</u>

Plaintiff contends that Defendant "Etchebehere denies 'authoring' 2012 Ramadan memorandum" in her answer, yet admits doing so in her summary judgment declaration. (ECF No. 101 at 2.) However, Defendant submits that in her answer in response to the claim "On or around July 11th 2012, Plaintiff was informed by Defendant Etchebehere that he could not receive his mandatory religious meals … if he was not a participant in [the RMA diet]" (ECF No. 1 at 7), Defendant stated: "[D]enies. Rather, Defendant signed a memorandum dated July 11, 2012, regarding … the religious observance of Ramadan." (ECF No. 12 at 4, ¶ 11.) Defendant submits that she construed Plaintiff's complaint as alleging that she personally informed Plaintiff of the Ramadan policy, which she denied doing, and therefore Etchebehere never denied authoring the memorandum because that was not the allegation posed. The Court agrees with Defendant's interpretation and there is simply no basis for sanctions.

4. <u>Minutes from Ramadan Planning Meetings at the Institution</u>

Plaintiff continues to argue that Defendant have withheld "minutes" from Ramadan planning meetings that took place at the institution in prior years. The Court has previously ruled on this issue on three separate occasions and issued an order requiring Plaintiff to pay Defendants' reasonable expenses which as stayed. (ECF Nos. 55, 65, 75, 81, 86, 88.) As Plaintiff has previously been advised, Defendants have attested that turned over all of the "minutes" they could locate, and no further order is warranted. (ECF No. 81.)

Plaintiff also contends that Defendants refused to provide Defendant Etchebehere's training records which would purportedly show that she was trained on how to route these minutes to CDCR headquarters. (ECF No. 101 at 19-20.) Defendant Etchebehere submits that she has previously denied possessing records regarding such training. (See ECF No. 79-7 at 65-67.) Furthermore, Defendant Etchebehere began overseeing the religious programs in March 2012, and therefore any previous minutes that were supposed to be forwarded prior to that date would not have been the responsible of Defendant Etchebehere.

5.     Denial of Individual Responsible for Proposing to Use the RMA/Halal Diet List as Starting Point for Identifying Inmates for Ramadan

Plaintiff claims that, in her responses to Plaintiff's second set of requests for admission, Defendant Etchebehere denied knowing the individual who proposed to use the RMA diet list for identifying Muslim inmates for Ramadan, but in her declaration she later stated that it was her responsibility.  (ECF NO. 101 at 2.)  Contrary to Plaintiff's argument, a review of Defendant Etchebehere's request for admissions responses does not reflect such statement.  In addition, in her declaration, Defendant Etchebehere stated "we proposed to use the RMA diet list as the starting point for identifying which inmates would be eligible to participate in Ramadan."  (ECF No. 84-5 at 4, ¶ 18.)  Accordingly, there is no support for Plaintiff's argument that Defendant Etchebehere contradicted herself in identifying the responsible individual for proposing to use the RMA/Halal diet list.

6.     Defendant Etchebehere's Personal knowledge Regarding How the Institution Planned for Ramadan Prior to Her Arrival

Plaintiff argues that Defendant Etchebehere should have been more diligent in discovering how the institution planned for Ramadan prior to her arrival.  (ECF No. 101 at 5.)  Plaintiff contends there is a contradiction between Etchebehere's request for admission responses (stating she lacked knowledge of the issue) and her summary judgment declaration (stating that he had been informed of a "basic framework" as to how Ramadan was planned).  As evidenced by a full reading of Defendant Etchebehere's declaration, the "basic framework" referenced to in the declaration is the basic concept of assembling a list of Ramadan-eligible inmates.  (ECF No. 84-5 at 2.)   In the declaration, Etchebehere does not indicate that she specifically knew how the list was created, and she has denied such knowledge.  (Id. at 3, ¶ 13.)  Accordingly, there is no contradiction established.

7.     Attorney Certification to Declarations

Plaintiff argues that all of the Defendants' declarations are deficient because they were submitted without "attorney certification under FRCP 26(g)."  (ECF No. 101 at 5.)  Plaintiff's argument is misplaced.  Rule 26(g) deals with attorney verification of a "discovery request, response

or objection," not declarations submitted in support of a motion for summary judgment. Fed. R. Civ. P. 26(g). Accordingly, Plaintiff's argument lacks merit.

        8.   <u>Review and Changes to Deposition Transcript</u>

Plaintiff contends, as previously raised by way of a motion to suppress his deposition, that "no copy [of his deposition transcript was] given to [him] for review." (ECF No. 101 at 3.) As determined in the Court's May 1, 2017, order, Plaintiff had the opportunity to review and make changes to his deposition transcript, and signed a declaration under penalty of perjury stating that he in fact had done so. (ECF No. 99.) Accordingly, there is no merit to Plaintiff's argument.

**V.**

**RECOMMENDATIONS**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     Defendants' motion for summary judgment be granted; and

2.     Plaintiff's motion for sanctions be denied.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __**June 27, 2017**__

                            UNITED STATES MAGISTRATE JUDGE